IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
17 JUL -7 PM 2:12
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
      DEPUTY CLERK

UNITED STATES OF AMERICA

v.                                           CAUSE NO. A-17-CR-142-SS

ANDRE MORENO O'BRIEN

---

## ORDER

BE IT REMEMBERED on the 15th day of June 2017, the Court held a hearing in the above-styled cause, and the parties appeared in person and through counsel. Before the Court are Defendant Andre Moreno O'Brien (O'Brien)'s Motion to Suppress Evidence [#21], the United States (the Government)'s Response [#25], the Government's Supplemental Brief [#33], and O'Brien's Supplemental Brief [#34]. Having reviewed the documents, the evidence presented at the hearing, the arguments of counsel, and the governing law, the Court now enters the following opinion and order DENYING the motion to suppress.

### Background

At approximately 12:21 a.m. on September 9, 2016, Austin Police Department (APD) Detectives Brian Molleur and Richard Faithful were in the process of responding to a call to check a triggered alarm system when they were advised through their central dispatch system of the need to respond to a disturbance near 9009 North Plaza, Austin, Texas. Detective Molleur has fourteen years of experience with APD and previously spent five years in the role of patrol officer. Detective Faithful has twenty-six years of experience with APD and previously served over three years as a

patrol officer. Although Detectives Molleur and Faithful typically worked as homicide detectives, on September 9, 2016, the Detectives were serving as patrol officers due to a personnel shortage.

Detectives Molleur and Faithful were not originally assigned to respond to the 9009 North Plaza disturbance call but self-assigned to call after realizing they were no more than two miles away. Detective Molleur testified he was familiar with the area and knew it was prone to criminal activity such as family disturbances and burglaries.

Both Detectives testified the only information they received about the 9009 North Plaza disturbance call came from the APD computer-aided dispatch system (CAD system).[1] Through a computer in the patrol car, the CAD system updates call information in real-time. The CAD system also logs this data, which can be accessed for later review (CAD logs).

Concerning the 9009 North Plaza disturbance call, starting at 12:24:07 a.m. the CAD system reported the following:

> xfer from 311 [. . .] unk gc [. . .] cnc [. . .] m vs f . . . verb [. . .] mtf
> occ10 min ago
> susp last seen at back to abv loc . . . poss still outside
> susp is poss bm . . . poss wrng dark clothing
> no wpns seen [. . .] yes drug use
> susp also holding a dark backpack
> susp poss still outside gate at rear of complex

Resp. [#25-2] Ex. 2 (CAD logs) at 3.

From this information, the Detectives testified they learned a telephone call from a female had been transferred from 311, the informational hotline, to APD. The Detectives also learned there

---

[1] Although a full transcript of the conversation between the caller and the 911 dispatcher is available, *see* Mot. Suppress [#21-1] Ex. A (911 Call Tr.), both Detectives testified they only had the information supplied by the CAD system. Thus, the Court only looks to the information the Detectives possessed at the time they stopped O'Brien in evaluating whether the Detectives had reasonable suspicion.

had been a verbal altercation between a man and a woman approximately ten minutes ago. The Detectives further testified the CAD system informed them the suspect was possibly a black male, holding a dark backpack, and possibly wearing dark clothing. Furthermore, the CAD system informed the Detectives the suspect was possibly still outside the gate of apartment complex. The relayed information indicated the caller had not seen any weapons but had seen evidence of drug use. In his testimony, Detective Molleur classified the information the Detectives received from the first call via the CAD system as a "general description."

Shortly after the information from the first call was shared over the CAD system, information from a second call, from a different caller, was appended. CAD logs at 3. After a reference to the second caller's name and telephone number, the following information from the second call was transmitted:

> "adv bm wrng gry shirt/gry gym shorts carrying a blk back pack following her car near bldg 130 [. . .] comp now sees susp walking nb on north pls towards the gas station on the corner[.]"

*Id.* Detective Faithful testified the information from the second call indicated a female caller had complained about a person following her car. The second caller described the suspect as a black male wearing a gray shirt, gray gym shorts, and a black backpack and last seen walking north on North Plaza.

According to Detective Molleur's testimony, he was looking for a suspect with the common characteristics relayed by the two callers—namely a black male wearing dark clothing and carrying a black or dark backpack—as the Detectives drove to the locations from which the calls originated. Detective Faithful testified it was not uncommon for witnesses to perceive things differently and the general characteristics of the two calls indicated a male following one woman and having a verbal

altercation with another. Detective Faithful further testified that, although one caller described the suspect's clothing and the other provided only a minimal clothing description, both callers indicated a black male wearing dark-colored clothing and carrying a dark-colored backpack.

At approximately 1:00 am, about twenty minutes after the second call, Detectives Molleur and Faithful turned their marked police car, equipped with lights and a siren, onto North Plaza. Detective Faithful was driving while Detective Molleur sat in the passenger seat.

As Detective Molleur and Faithful drove from their prior location to and along North Plaza, they encountered no person except O'Brien. The Detectives spotted O'Brien walking northbound on the sidewalk of the 8900 block shortly after they turned onto North Plaza. Resp. [#25] Ex. 3 (Patrol Video) at 1:01:07. The 8900 block is south of where the second call reported the suspect to be and slightly south of the location from which the first call was made. *See* Mot. Suppress [#21-2] Ex. B (Map of North Plaza). The Detectives shined a spotlight on O'Brien from their patrol car and pulled over alongside O'Brien. Patrol Video at 1:01:08–1:01:13. O'Brien was wearing a backpack on his back and carrying a duffle with a plastic shopping bag on his right shoulder. *Id.*

Detective Molleur testified when he observed O'Brien walking along the street wearing a dark-colored backpack he believed O'Brien was the suspect, especially as he hadn't seen anyone else on the streets at that time of night. Detective Molleur did not recall seeing O'Brien's clothing. Detective Faithful testified he also believed O'Brien was the suspect identified by the two callers because O'Brien was in the general location the last caller stated the suspect had been, there were no other people around, and O'Brien was wearing a dark-colored backpack. Detective Faithful also testified O'Brien's skin color was unclear but O'Brien could have been perceived as black. Detective Faithful pulled the patrol car over to investigate.

O'Brien had been walking away from the Detectives' vehicle and when they pulled over toward the sidewalk, he stopped walking and turned around to face them. Patrol Video at 1:01:13–18. O'Brien was wearing pants and a t-shirt. *Id.* at 1:01:16. The precise colors of O'Brien's clothing are unclear from the black and white footage of the patrol car's dashboard camera but they appear to be dark-colored. *Id.*

Detective Faithful exited the vehicle and approached O'Brien asking, "How's it going?" *Id.* at 1:01:18. Detective Molleur lingered in the vehicle to inform dispatch they had stopped the suspect. As he moved toward O'Brien, Detective Faithful stated, "Somebody called in about you. Did you have a disturbance with anybody?" *Id.* at 1:01:18–1:01:24. O'Brien responded "No, sir" and, after stuttering for a bit, explained he had been recharging the battery of his cell phone at his friend's house by the Walmart. *Id.* at 1:01:25–1:01:36. Detective Faithful testified O'Brien appeared to be searching for what to say.

After the exchange of a few short indistinguishable comments, Detective Faithful asked O'Brien if he had identification on him, and O'Brien answered, "Yes, sir." *Id.* at 1:01:43–1:01:45. As O'Brien moved his backpack in front of his person, Detective Faithful asked O'Brien if his identification was in his backpack. *Id.* at 1:01:45–1:01:47. O'Brien again responded with "Yes, sir" as he set the backpack on the ground. *Id.* at 1:01:49–1:01:51. Detective Faithful testified that, generally, when he is interacting with a person on the street at 1:00 a.m. and the person moves a backpack toward him, he is going to stop the conversation and check the person for weapons. Detective Faithful told O'Brien to "hold on." *Id.* at 1:01:51. Moving toward the left side of O'Brien and putting his left hand out toward O'Brien's shoulder, Detective Faithful asked, "You don't have

any weapons on you, do you?" *Id.* at 1:01:52. It appeared Detective Faithful was moving to frisk O'Brien. *Id.* At that point, O'Brien turned to the right and began running. *Id.* at 1:01:53.

Detective Faithful chased O'Brien on foot while Detective Molleur returned to the patrol car to pursue O'Brien from the vehicle. Mot. Supp. [#21] at 6; Resp. [#25] at 4. While driving, Detective Molleur radioed dispatch with a description of O'Brien. Detective Molleur described O'Brien as wearing a white stripped shirt and green pants. After pursuing O'Brien through a parking lot, Detective Molleur eventually parked the patrol car and engaged O'Brien. O'Brien and Detective Molleur struggled, but Detective Molleur ultimately gained the upper hand. Following an altercation, the Detectives were able to restrain O'Brien. Mot. Supp. [#21] at 6; Resp. [#25] at 4–5. The Detectives discovered an orange flare gun—which the Government alleges to have been modified to shoot a shotgun shell—in O'Brien's waistband and two modified 12-gauge shells in his pocket. Mot. Supp. [#21] at 6; Resp. [#25] at 4–5.

A picture of O'Brien following his arrest shows his torn shirt. *See* Resp. [#25-6] Ex. 7 (O'Brien Picture). Detective Molleur testified the shirt is composed of thin blue and white stripes, but the shirt in the picture appears gray. *See id.*

On March 21, 2017, O'Brien was charged in a four-count indictment alleging (1) felon in possession of a firearm, 18 U.S.C. § 922(g); (2) possession of an unregistered firearm, 26 U.S.C. § 5861(d); (3) unlawful making, altering, and otherwise producing a firearm, 26 U.S.C. §§ 5822 and 5861(f); (4) and possession of a firearm without a serial number, 26 U.S.C. § 5861(I). Indictment [#1].

In advance of his trial, O'Brien filed a motion to suppress the flare gun and shells found on his person. In particular, O'Brien claims Detectives Faithful and Molleur violated his Fourth

Amendment right to be free from unreasonable search and seizure because he was stopped without reasonable suspicion. O'Brien argues the Detectives had no reasonable suspicion of criminal activity because neither of the two callers had identified any criminal activity. O'Brien also argues the detectives did not have reasonable suspicion to detain him because he is a brown-skinned Brazilian man who, at the time of stop, was wearing a "white striped shirt and green pants" while the callers reported a black man dressed in a dark-colored or in a gray shirt and shorts. Additionally, O'Brien claims there was no reasonable suspicion to frisk.

## Analysis

### I. Legal Standard

Where a police officer acts without a warrant, the government bears the burden of proving the search or seizure was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). "A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). Furthermore, a seizure under the Fourth Amendment must be "justified at is inception" and not by subsequent events. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004)).

"Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted). Furthermore, the United States Supreme Court has "consistently recognized that

reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette v. California*, 134 S.Ct. 1683, 1688 (2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).

A court considers the totality of the circumstances when evaluating whether an officer's suspicion was reasonable. *Hill*, 752 F.3d at 1033 (citing *Arvizu*, 534 U.S. at 273–74). The analysis of whether an officer had reasonable suspicion considers "both the content of information possessed by police and its degree of reliability." *Navarette*, 134 S.Ct. at 1687 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

## II. Application

In determining whether a seizure was justified at its inception, the Court examines whether the officers had an "'articulable suspicion that a person has committed or is about to commit a crime'" as "opposed to a mere hunch." *United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006) (emphasis omitted) (quoting *Florida v. Royer*, 460 U.S. 491 (1983)). "[I]f a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain—that is, 'seize'—the person to investigate." *Hill*, 752 F.3d at 1033 (citations omitted).

O'Brien argues his stop was improper because (1) the police lacked reasonable suspicion to believe a crime had been or was about to be committed; and (2) O'Brien's description "directly contradicted" the description of the black man identified in the calls to police. *See* Mot. Suppress [#21] at 6–12. The Court reviews each of these arguments in turn before evaluating whether a frisk of O'Brien was justified.

## A. Detectives had reasonable suspicion of criminal activity.

Here, Detectives Molleur and Faithful could both point to specific and articulable facts that led them to reasonably suspect a crime was committed or was about to be committed. First, Detective Molleur testified he was familiar with the area surrounding North Plaza and knew it was prone to criminal activity such as family disturbances and burglaries. *See Hill*, 752 F.3d at 1035 ("The fact that law enforcement officers know a particular area to be high in crime is indeed a 'relevant contextual consideration.'" (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))).

Second, both Detectives relied on the information from the CAD system indicating two calls reporting a suspicious male within ten minutes of each other. By appending the information from the second call to the first, dispatch suggested the two callers were identifying the same man. *See* CAD logs at 3. The information conveyed to the Detectives indicated both calls were placed after midnight and came from female callers located within a block of each other. *See id.* As relayed to the Detectives, both callers described a black male wearing dark-colored clothing and carrying a dark-colored backpack. *See id.* The first caller reported a verbal altercation with the man, the man seemed to be on drugs, and the man was possibly waiting outside of the gate of her apartment complex. *see id.* The second caller reported a man had been following her car and was still in the general area. *See id.* These facts alone justify the reasonable suspicion the man identified by the callers was wandering around the North Plaza area on drugs, potentially seeking to commit assault, robbery, or burglary against a woman.

In sum, the Detectives have shown they relied on specific and articulable facts in forming their suspicion a crime had been or was about to be committed by the man identified by the two callers.

**B.     Detectives had reasonable suspicion O'Brien was the suspect.**

The Detectives have also articulated specific facts on which they relied in forming the reasonable suspicion O'Brien was the suspect described in the information relayed by the CAD system. All of the facts articulated and relied on by the Detectives are confirmed by the Patrol Video footage.

The Detectives were informed the suspect was possibly black, wearing dark-colored clothes, wearing a dark backpack, and walking northbound on North Plaza. When the Detectives observed O'Brien, he was walking alone along North Plaza after one in the morning. Although twenty-minutes had passed since the first call had been placed, O'Brien was within a block of the location of the first caller. As the Detectives approached O'Brien, Detective Faithful shown a spotlight on O'Brien, and the Detectives confirmed O'Brien was carrying a dark-colored backpack as well as other items. Both Detectives testified that in driving from their last location to where they stopped O'Brien, they had not seen another person on the streets, let alone another person carrying a backpack.

Moreover, O'Brien is a Brazilian man with an olive complexion that could easily be perceived as black, especially at night. *See* Patrol Video; O'Brien Picture. Likewise, O'Brien appeared to be wearing dark-colored clothes similar to the clothes described in the calls. *See id.* Simply put, O'Brien's description did not directly contradict the description of the suspect identified in the calls to police

O'Brien argues the information relayed by the CAD system from the calls did not provide reasonable suspicion and was uncorroborated by the officers in the field. *See* Mot. Supp [#21] at 7–8; Def.'s Supp. Br. [#34] at 5–6. In particular, Defendant claims the stop of O'Brien was not justified

because it cannot meet the Fifth Circuit's four-factor test for a seizure based on a tip. *See* Def.'s Supp. Br. [#34] at 5–6 (citing *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010)).

The Fifth Circuit has stated a reviewing court considers four factors where a tip is alleged to provide reasonable suspicion for an investigative stop: (1) the credibility and reliability of the informant, (2) the specificity of the information contained in the tip or report, (3) the extent to which the information in the tip or report can be verified by officers in the field, and (4) whether the tip or report concerns active or recent activity. *United States v. Zamora*, 661 F.3d 200, 207 (5th Cir. 2011) (quotation and citation omitted).

In this case, the Court finds the callers in this case did provide reasonable suspicion for an investigative stop. First, the combination of the two female callers from the same area who reported a similar person for the same type of threatening activity within minutes of each other lends credibility and reliability to the information. Moreover, both callers did not remain anonymous but gave their name and telephone number to the dispatcher. Second, both callers were specific in consistently describing the suspect as possibly black, wearing dark-colored clothing, and carrying a dark-colored backpack. Furthermore, the second caller specifically identified the man's threatening behavior, following her car. Third, the Detectives corroborated the information from the callers to extent possible; they observed a man who could possibly be black walking along the callers' street late at night wearing dark-colored clothing and a dark-colored backpack. The Detectives' observations of how O'Brien matched the suspect's description are enhanced by the fact that O'Brien was the only person on North Plaza at 1:00 a.m. Fourth, both calls immediately reported the suspicious activity after it happened, and only forty minutes passed between the first call and when Detectives Molleur and Faithful encountered O'Brien. Finally, both calls indicated the suspect was

still in the same area, suggesting ongoing activity. Consequently, having considered the factors set forth in *Zamora*, the Court finds the tips provided reasonable suspicion for an investigative stop.

In addition, O'Brien cites *United States v. Jones*, 619 F.2d 494 (5th Cir. 1980) for the proposition there is no reasonable suspicion where an officer stops an individual solely for partially matching a suspect's description. Def.'s Supp. Br. [#34] at 8. However, the facts of *Jones* are distinguishable from the facts of this case. In *Jones*, the officer stopped the defendant a day after the officer had heard a general description of a robber on the police radio. 619 F.2d at 496. The officer admitted he only heard part of the description from the radio, and he believed "the police were looking for a black male, 5 feet 6 inches to 5 feet 9 inches tall and weighing between 150 and 180 pounds, with a medium afro hair style, who was wearing jeans and a long denim jacket." *Id.* at 497. When the officer spotted the defendant, who was observed walking along a street the day after the robbery, the officer thought the defendant generally matched the description and approached him. *Id.* In that case, the Fifth Circuit found insufficient facts to authorize an investigative stop because the officer acted on the basis of an "incomplete and stale description of a suspect that could, plainly, have fit many people." *Id.* at 498.

Unlike the officer in *Jones*, the Detectives in this case had a description forty-minutes old at most. The description could not have fit many people because, as the Detectives testified, there did not appear to be anyone else on the street at that time of night. While both the officer in *Jones* and the Detectives in this case relied on a partial description of a suspect, the description in this case was generally confirmed by two callers and readily accessible to the Detective through the CAD system and its logs.

Thus, the Court concludes the Detectives relied on specific and articulable facts—facts confirmed by the Patrol Video footage—and therefore had reasonable suspicion to stop O'Brien to investigate if he was the suspect reported by the two callers. Any reasonable officer in the Detectives' position would also have stopped O'Brien to investigate if he was the suspect reported by the callers.

C.  **Detective Faithful had reasonable suspicion to frisk O'Brien.**

An officer may conduct a limited search for weapons that might be used to assault the officer if "'a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of other was in danger.'" *United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

After Detective Faithful stopped O'Brien and asked for identification, O'Brien moved his backpack to the front of his body and motioned as if he was going to open the backpack. Almost simultaneously, Detective Faithful also asked, "You don't have any weapons on you, do you? and put his left hand out toward O'Brien's shoulder. Patrol Video at 1:01:52. Immediately, O'Brien bolted. *Id.* Although Detective Faithful did not actually frisk O'Brien before O'Brien fled, it appears Detective Faithful may have intended to frisk O'Brien.

Detective Faithful stopped O'Brien on the street after 1:00 a.m. Besides the Detectives and O'Brien, the street was deserted. As captured on the Patrol Video, when Detective Faithful asked O'Brien for identification, O'Brien moved his backpack to the front of his body. The Patrol Video footage confirms Detective Faithful did not ask O'Brien if he possessed weapons or make any motion to frisk until O'Brien placed the backpack between him and the Detective and acted as if he was going to removed items from it. Detective Faithful testified that, generally, when he is interacting

with a person on the street late at night and the person moves a backpack toward him, he is going to check the person for weapons. After stopping an individual on a vacant street late at night, a reasonably prudent officer would conduct a limited search for weapons after the individual indicated he intended to remove items from a backpack.

## Conclusion

In light of the totality of the circumstances, the Court finds Detectives Molleur and Faithful had reasonable suspicion the man identified by two female callers had committed or was about to commit a crime and the man reported by the two callers was O'Brien. Any reasonable officer responding to the information relayed by the CAD system would have stopped O'Brien to investigate. Finally, a reasonably prudent officer would conduct a limited search of O'Brien after O'Brien indicated he intended to pull items out of his backpack. Therefore, Detectives Faithful and Molleur did not violate O'Brien's Fourth Amendment right to be free from unreasonable search and seizure in conducting an investigative stop.

Accordingly,

IT IS ORDERED that Defendant Andre Moreno O'Brien's Motion to Suppress Evidence [#21] is DENIED.

SIGNED this the 7th day of July 2017.

/s/ Sam Sparks
SAM SPARKS
UNITED STATES DISTRICT JUDGE